and Mr. Martin Bright is here also. He will be handling the rebuttal. So I would like to reserve approximately three minutes for rebuttal. Your Honors, this case is a deprivation of counsel case. That's what we have. We have a complete deprivation of counsel at a critical stage of the proceedings, and then we have an involuntary Feretta waiver. And stacked on top of that, we have an involuntary waiver of the right to have a jury determine the amount of loss. In the government's brief, the government questioned whether or not there was a right to have a jury determine the amount of loss. The issue here is that the judge solicited such a waiver from counsel. The determine the amount of loss. And when she said, I don't know, Your Honor, you know, what would a jury do? The judge probably should have said to her, it would have determined a factual issue that could affect your sentencing. But the court didn't do that. And so she did not know what she was waiving when she gave that up. There are a couple of things I wanted to address that are not in the briefs. The first one is that I did get confused between count 11 and count 12 in the insufficient evidence argument. The argument doesn't change. The reason why I got confused, and I discovered this again when I was preparing, is that there is zero evidence as to Mr. Ramos that there was any corrupt persuasion. There was not even a conversation between Mr. Ramos and Christine Daniel concerning any testimony to the grand jury, any testimony to the court, or any conversation with the authorities. The falsity, if it was false, of Mr. Ramos' representation that the payment was a donation was an item on his checks. And people in the defendant's office saying, it's a good idea to put it as donations. Not, I'm under investigation, you can help me out. Not, I'm trying to show that this is not a taxable event. But just put donation. Nothing indicating if anybody asks you, say donation. Nothing indicating if you testify, say donation. It just isn't there. So when I was writing the brief and when I was reading the record and when I was preparing for the case, preparing for argument, I simply could not believe that he had been convicted on that count. So I apologize if it misled the court, and that's why I addressed the wrong count. Your client is a she. She, yes. Yeah, you said he. You said he had been convicted. It wasn't the witness who got convicted. No, no, no. That's true. She had, yes. Well, I guess I don't share your shock at all. It certainly was a jury question. I can see the jury going either way. They did acquit on the other account. Yes. But why isn't it enough when you know you're under investigation and you know, tell me if this is wrong, but you know that there's at least a possibility that this patient you're dealing with may in fact be called either to testify before some medical board or before the grand jury in a criminal case. And you sort of make clear that, look, we need to start calling these payments you're giving me something else. So please be sure from now on to write this false thing on your checks. You don't think that conveys to the patient as it did here that, oh, you know what? I want to help out my doctor. She's been really good to me. She's telling me that me that it's important that I now call it this. So lo and behold, when he shows up before the grand jury, that's what he calls it. That doesn't strike me as a preposterous case at all. No, Justice Wofford, particularly in the context of the fact that she was acquitted of the case involving the Kellenbergs where there were conversations about, they happened after they had testified, but there were conversations about the grand jury testimony. What was key there is that the jury thought because the conversations occurred after the witness had already given whatever testimony they were going to be called upon to give, she wasn't going to get convicted there, but here it happened before. And so why wasn't the jury entitled to infer that she knew that this patient she was dealing with who had not yet testified, but was perhaps going to, that she wanted to influence what he would eventually say? Because there was no evidence of any discussion involving testimony or investigation or whether that she was under investigation. Do you think to be convicted, she had to tell the patient in explicit terms, listen, I'm under investigation. And if you put down, if you don't put down here, that's a donation, I could go to jail. And so please do this to help me avoid prosecution. I believe if the charges corruptly persuade somebody to testify falsely or give false information, yes, you have to, you have to say. Persuasion can be kind of soft. She set it up. He did it. He followed through. She set it up. I mean, does persuasion have to, have to be something, you know, where I've got you on the ground with my knee on your throat or something like that? I think at least it has to rise just a strut to if anybody asks you or if you're, if you're investigated or I'm facing this, it has to be some kind of connection, something more than just recognition. Didn't she set up the deception by asking him to do something? Didn't she persuade him to put that on the check? He didn't put it on there just out of the air. That's true. I'll go that far. She persuaded him to put it on the check. But she didn't persuade him. She didn't tell him the checks were going to be examined by anybody else. She didn't tell him. Of course not. She wouldn't say, hey, look, you know, I'm asking you to commit a crime because the grand jury is looking at this. Of course she wouldn't tell him that. But she set up exactly what happened. That's the point. I just don't feel that that's enough beyond a reasonable doubt to get the persuasion to testify falsely. You're saying as a matter of law, there has to be a conversation. Is that what you're saying? There has to be some attempt to persuade somebody to testify falsely, not just to put something on the check. The whole point of this was to create a false piece of evidence. Wasn't it? But the expectation wasn't that anybody else was. I don't know what he thought or she thought the purpose of putting a memo on the check was. She may have thought that she might have been audited again. She may have thought that it was a matter of keeping records. But I don't think it had to do with anything that he was going to say. I don't think there was any knowledge or expectation that he was going to testify or be investigated. You're down to your three minutes unless my colleagues have other questions, then you can reserve the remaining time for the rebuttal. I would like one more minute, which is that what the court should keep in mind is the enormity of the deprivation of counsel in this case. That's the major issue. What was left in the trial when all of this happened? The deprivation of counsel? Yeah. At a very critical stage. When Mr. Banjo had, before his daughter died, asked to reopen the defense case. His daughter died. The case was continued for a very, very long time. And then it was time for rebuttal and closing argument. Thank you. I think it's an extremely critical point in the case. May it please the Court. Ilana Artin on behalf of the United States. Let me briefly address the witness tampering. In all honesty, I think that Judge Watford and Judge Trott have made my argument for me. But yes, she, the jury could find, corruptly persuaded Mr. Ramos, after many years of writing checks, which had in the memo line medication, he, at her request, wrote donation. Could the jury infer that she did that with the intent to either persuade him to change his grand jury testimony or to prevent him from reporting her to law enforcement? And clearly, intent can be inferred from any number of actions. And given the fact that she knew she was under investigation because her residence and business had been searched prior to this time and because grand jury subpoenas were being issued, there clearly was a basis for the jury to infer that that was her intent. And in fact, it was successful. Mr. Ramos did initially give false information to the California Medical Board investigator and to the grand jury, which he later corrected. So there was more than sufficient evidence to convict on the witness tampering count. Now, I think the real issue in this case is the issues that relate to counsel. There are two separate Sixth Amendment rights that are implicated here. The first is the right that all defendants have to the effective assistance of counsel. And the second is the right to choice of counsel for those who can afford to retain their own counsel. With respect to the choice of counsel, that choice can be limited when a contrary result is compelled by the purposes inherent in the fair, efficient, and orderly administration of justice. In this case... Can I jump in and just ask you just to cut to the chase in my own thinking? Yes. Am I right in thinking that in order to affirm here, we would have to conclude that the district court was right in, I think, in questioning the credibility of defense counsel's assertions that he couldn't continue? Essentially, what I would say is the real issue in this case is the court's finding that defense counsel could give effective assistance of counsel. I would say that is partly, maybe largely, a credibility determination. But I'm not saying it's entirely a credibility determination. Well, because he was saying that he couldn't under circumstances where I think it's quite plausible to understand why someone in his circumstances really could not continue. I mean, certainly the folks I've known who've lost kids who are professionals, they could not go back to certainly not trying a case within three months. It took much longer. So what I read from this record, though, is that the court said, but you're trying these other cases, and I guess I don't understand why you can't try this one. And so it seems to me it all comes down to whether the judge was right in saying, well, I just don't believe you when you say that you can't do this particular case. I agree. And I agree absolutely that that is exactly what it comes down to, and that's why this court should defer to Judge Timlin. I would also say that I do think even the cold record supports Judge Timlin's ultimate finding, and that's why I wouldn't say that this is sort of 100 percent you have to rely on him without having any basis to know what he decided. Okay. So what do we have to give us confidence? Well, I think what you have to give you confidence is, first of all, the fact that we're talking about a very experienced judge who conducted three really detailed hearings on this point. Remember, initially the event happened on May 13th, so trial was continued for a month, and on June 22nd we have the first hearing. And at that hearing it's quite apparent that Mr. Banjo is just not in a condition to do anything. He's not practicing law. He, you know, maybe has tried to put a toe in the water with some minor cases and has been unable to do that. He's undergoing therapy. He's really quite consumed with his daughter's death, and he repeatedly talks about that. And at the end of that hearing Judge Timlin makes a finding, and he says, Look, I've watched counsel, I've listened to counsel, and it's apparent to me that he cannot. Are those factual and credibility determinations we review under the clearly erroneous standard, for example? I think they are, Your Honor. The question is, what happened between June and August 23rd when the resumption date had been continued? And I think even the cold record shows that the situation had really changed dramatically. At that point, Mr. Banjo had basically returned to a very full calendar. In fact, he was complaining that he couldn't continue this case to September 13th because he had a trial the week before a criminal case that was going to be going. He had a complex trial. But that evidence that he's back in practice needs to be balanced against his claim that it's the medical nature of this. It's the doctor, it's the medical profession. What he believed was an injustice or worse that befell his daughter in the medical system. So what I think Daniel is saying is that there's this bias on the medical system, and that is who your client is. How do you address that? Well, two ways. I think, first of all, on the claim of bias, I think the judge was absolutely justified in rejecting this incredibly belated claim that arose basically a week before the trial was supposed to resume after a four-month break is the first time we ever hear about this alleged bias. We don't hear anything back in June when she repeatedly tells the court that she wants Mr. Banjo to represent her, even though the supposed bias would have arisen before that because she claimed that this conversation occurred while she was talking to him about possibly suing for malpractice. And that was something that happened, as far as we can tell, early on, that she was having these conversations right after or at the time that the daughter was in the hospital. Moreover, I think that there was just no prior mention of hostility to doctors, and the fact that Mr. Banjo never said, I can't represent her at all. All he said is, he said, I could do the tax case. I could do the witness tampering case. I don't have anything, he repeatedly said, against this defendant. I just have a problem with the fraud counts. And so Judge Timlin honed in on that, and he said, well, tell me again, what exactly is your problem? And I would submit that in the end, it came down to the following. It came down to, here's the defense that my client wants to put on, and I can't argue it because I don't believe her testimony. She wants to argue that she never made any of these statements. That was her testimony. And I can't believe that anymore, so I cannot effectively represent her. You're putting a gloss on exactly what he didn't say that. No, but I think that's what Judge Timlin understood because that's what Judge Timlin kept saying. He didn't say this is what I understand, that what you're telling me is you can't argue a defense that you don't believe in. Is that what he said? Well, I think what he said at ER 300 is, if that's your problem, that's not a basis to withdraw because you can argue based on the evidence that is available the same way that any other defense lawyer who doesn't believe their client. What do you think Banjo was doing? What was he doing? Was he trying to screw up the case? Your Honor, nobody can read his mind. I wasn't there. I don't know. I know that this was a difficult client. I know that he felt that he, you know, wanted to try to present the case the way that she wanted to, and he didn't feel that he could do that. Did he say that in so many words? I don't think he said it in the way that I've just described it, but I think what he consistently said is what I can't do here is I can't discredit the government's witnesses, and I'm not sure that I believe her, and so how can I effectively argue that she should be credited? I'm sorry. I remember him stressing more the fact that this particular case involved a doctor whose poor care was alleged to have caused the death of folks, and I guess there was very powerful testimony from the victim's family members and the like, right? He says that I just experienced the exact same thing, and it's my kid, and it happened three months ago. I can't sit here and represent this person. Given the nature of these charges, yes, I'm trying to get back on track in my other cases, but this case I can't do, and it seems to me we'd have to infer that what the district judge here concluded, and that he concluded properly so, was that this was part of a, what do you call it, you know, where the client and the lawyer get together and say, hey, you know what? I'm going to go down. My best hope is to get a mistrial. You need to go up there and basically pretend that you can't continue to represent me, right? I don't agree with that, Your Honor, and I don't think that that's the way that Judge Timlin saw it either. I think what's going on here is defense counsel came in and said I don't feel I can give effective representation because my client has put on a defense that she never said any of these things, and I cannot discredit. He didn't say that. I don't remember that either. Well, Your Honor, if you look at what happened in the hearing on the 23rd, Bancho made a narrow claim. This is at GER 514. When the court sort of said, well, tell me what it is that you feel you can't do effectively, he said I have to discredit the government's witnesses and I can't do that anymore. And then at the hearing in September, again, the judge honed in on that and he said, now tell me what exactly is it that you feel you can't do? And he said, well, you know, in the hospital I was told two different things by two different doctors. Here, and I'm talking at ER 300 and 301, he said the government's witnesses say one thing, the defendant says another, and he says I can't believe her, so I don't feel that I can give an effective closing argument. And the judge responded, and I submit correctly, that is not a basis for withdrawal because if that's your ethical problem, we have rules in case law that tell you what to do. And what they say is, and we've cited O'Mean and Campbell and Lurie, a number of California cases about the California rules of professional conduct that govern lawyers who are in the Central District of California. The answer is not to withdraw because it just puts the next lawyer in the same situation  Well, the answer is the client is not entitled to present false testimony and they're not entitled to have a lawyer argue something that the lawyer doesn't believe is true. And that's why we have cases that have affirmed that you're not deprived of your right to effective assistance of counsel if the lawyer doesn't make objections to questions of the prosecutor or doesn't argue in closing testimony that the lawyer doesn't believe is true. That's what Judge Timlin said to do. What you need to do is you need to argue what you can. If you don't think that you should argue on the first element because you don't believe that she didn't make these statements, then you can argue that there's a reasonable doubt that she didn't have an intent to defraud or that there's a reasonable doubt on any other element. But we have guidelines and rules for what to do in that situation. And that's what, at ER 300, Judge Timlin said. If your problem is an ethical problem that you don't feel that you can give an effective defense because you don't believe your client, the answer to that is don't argue that she was truthful when she said she didn't make those statements. And frankly, any lawyer would have been in that situation. She was on tape on national television saying, We have stage four cancers that have a 60% cure rate, and we have a lab, and we buy herbs from all over the world. And she was on tape telling the California Medical Board investigator, Here's the price list, and these are the potencies of the drug, and even though the FDA doesn't allow me to say we do a cure, you know what we do. So what is a defense lawyer supposed to do in that situation? I don't think the answer here was to withdraw, and I think that's why this Court should defer to Judge Timlin because he had an opportunity to watch the defendant and the lawyer. He had an opportunity to look at Mr. Banjo and make a determination as to whether he could effectively represent this client. In January, Judge Timlin said no. In April, in August, and in September, after conducting very lengthy hearings and really probing what exactly was the problem, Judge Timlin concluded you could effectively represent this client. Maybe you don't want to because this is a difficult case or a difficult client. All right. I think we've got your argument in mind and certainly the briefing on that point, so thank you for your argument. Thank you. We'll put your time back on the clock. Thank you, Your Honors. Mark McBride, co-counsel. The heart and soul of the case is a medical case where the government ostensibly argued that this misdemeanor was hurting and killing people, and you have a defense attorney who has a four-year-old little daughter that died at the hand of a physician. The defense attorney put on the record that he wouldn't believe his client because she's a doctor. And so I think the proper colloquy I think that maybe Justice Watford was getting to was his offers of proof are adequate. He came back in June and he was virtually unhinged. I mean, he said he couldn't adequately represent her. If he's in bad shape, it doesn't matter if he's trying takeover-style bank robberies in that district. The heart and soul is a health care fraud case. And so he didn't believe his client. Judge Timlin put some weight, I don't know how much, on the fact that although Mr. Banjo was in therapy, that he didn't submit any kind of a declaration from a professional who could validate the claims he was making about his inability to try this particular case. I mean, if that in fact was really what was motivating his actions, why wouldn't he have at least gone to his therapist and said, hey, can you submit something? The court is questioning whether I'm telling the truth here. That's a good point, and I agree with that. But I think as an officer of the court, his representations are enough. I mean, I think the upshot of saying he was not to be believed or that the district's discretion here was correct is you would almost have to make a finding that he was lying to the court just to throw the or that he and Ms. Daniel were colluding to throw this case. There's just no evidence of that on the record. And so he didn't even give a closing argument in this complex, really emotional case. And the reason he didn't is for a lot of reasons, not least because he didn't believe in his client. And more to the point, again, he told the court he didn't believe her. She's a doctor. He was furious at his little daughter's doctor. And he came to court with that, and he can't defend her adequately, and the case should respectfully be reversed. Thank you. Thank you. Thank both counsel for the argument. It's a very difficult case. We acknowledge that. The case of United States v. Daniel is submitted, and we're adjourned for the morning. All rise.
judges: Trott, McKeown, Watford